UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEIDI WILLFORD a/k/a CELESTE WILLFORD,<br><br>Plaintiff,<br><br>V.<br><br>UNITED AIRLINES, INC.,<br><br>Defendants. | Civil Action No.<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff, Heidi Celeste Willford ("Ms. Willford" or Plaintiff), by and through her attorneys, Hach Rose Schirripa & Cheverie, LLP, complaining of the Defendant, United Airlines, Inc. ("United Airlines" or "United" or "Defendant"), brings this action for (1) employment discrimination and wrongful termination on the basis of her sex, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. L. §§ 296 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. Admin. Code § 8-101 *et seq.* ("NYCHRL"); (2) employment discrimination and wrongful termination on the basis of her disability, pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), the NYSHRL, and the NYCHRL; and (3) interference and retaliation with regard to medical leave pursuant to the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"). Plaintiff seeks appropriate monetary and other relief to redress the wrongdoing complained of herein:

## INTRODUCTION

1.     The issue of sex discrimination, particularly discrimination based on pregnancy, is a widespread problem in this country. Many women are discriminated against in their employment on the basis that they might become pregnant, and thereby require committed resources from their

employers while not actively working or being physically unable to work.  By placing concern for "the bottom line" ahead of concerns for their employees, many large corporations often take discriminatory actions that have a disparate impact on their female employees.

2.      United Airlines, an employer of close to a hundred thousand employees, is no exception.  Upon information and belief, Defendant discriminated against Plaintiff on the basis of her gender – specifically, because Defendant knew Plaintiff intended to get pregnant.

3.      Plaintiff, Celeste Willford, a member of a protected class (sex), served at United Airlines for nearly ten years as a flight attendant, and was a model employee, as evidenced by numerous letters of commendation in her employee file and, prior to Defendant's actions as detailed more fully herein, a clean dependability record.  She routinely put her job before herself, even continuing to work after being injured on duty.  Defendant improperly denied Plaintiff's petition for an emergency transfer in order to receive in vitro fertilization treatments.  Instead, Defendant told Plaintiff to apply for block leave under the FMLA to receive these treatments, which would cause her to miss additional work and forfeit compensation she should have earned, or else resign her employment.  Plaintiff seeks appropriate monetary and other relief to redress the wrongdoing complained of herein.

4.      Plaintiff is also a member of a second protected class (disability) and brings this action for employment discrimination and wrongful termination based upon her disability, pursuant to the NYSHRL and the NYCHRL.  Plaintiff also brings this action pursuant to the ADA, for discrimination on the basis of her disability.  Plaintiff seeks appropriate monetary and other relief to redress the wrongdoing complained of herein.

5.      Plaintiff additionally brings this action pursuant to the FMLA, for FMLA interference and retaliation.  Plaintiff seeks appropriate monetary and other relief to redress the

wrongdoing complained of herein.

6.    Plaintiff exercised her right to take FMLA leave to treat a disability, specifically a chronic disability suffered in the line of work.  When Plaintiff offered to return from her leave early in order to help Defendant cover an understaffed flight, Defendant used Plaintiff's selfless offer as a pretext to terminate her employment.

## JURISDICTION AND VENUE

7.    This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as well as under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*  This Court has supplemental jurisdiction over Plaintiff's New York State Human Rights Law, N.Y. Exec. L. §§ 296 *et seq.*, and New York City Human Rights Law, N.Y. Admin. Code § 8-101 *et seq.*, claims pursuant to 28 U.S.C. § 1367, as they are related to the claims in this action within the Court's original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution.

8.    Venue is properly laid in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), because the claims arose in this judicial district, and Defendant is a corporation that resides in this district pursuant to 28 U.S.C. § 1391(c).

## PARTIES

9.    Plaintiff, Celeste Willford ("Ms. Willford"), is a 43 year-old woman.  Ms. Willford was employed by Defendant as a flight attendant from March 2006 until she was wrongfully terminated on February 22, 2016.  Ms. Willford resides in New York County, New York.

10.    Defendant United Airlines, Inc. is a domestic corporation registered under the laws of the State of Delaware and headquartered at 233 South Wacker Drive, Chicago, Illinois 60606.

United does business across the United States and internationally, including in the State of New York.  United is one of the largest commercial airlines in the world, with well over 80,000 employees, more than 11,000 of whom work in flight operations, including flight attendants.  At all times hereinafter mentioned, United was, and still is, an "employer" under the ADA, 42 U.S.C. § 12111(5)(A), the FMLA, 29 U.S.C. § 2611(4)(A)(i), New York Executive Law §§ 292(5), and New York City Administrative Code § 8-102(5).

## SUBSTANTIVE ALLEGATIONS

## I.  UNITED DISCRIMINATED AGAINST MS. WILLFORD ON THE BASIS OF HER SEX AND DISABILITY

### Background

11.     United employs over 80,000 persons who work in a wide variety of functions, over 11,000 of whom work in flight operations alone.  Ms. Willford is a flight attendant who, at all relevant times herein, was employed by United.

12.     United is responsible for all conditions and terms of employment, including but not limited to hiring, paying, firing, controlling work hours, directing various job responsibilities, and scheduling any approved absences, whether for vacation, medical leave, or any other reason.

13.     United maintains the following mission statement in its "Code of Ethics and Business Conduct":

> United provides equal opportunity to all employees and applicants, and we work to achieve a workplace free of discrimination and harassment on the basis of age, citizenship, color, disability, gender, gender identity, genetic information, national origin, pregnancy, race, religion, sexual orientation, veteran status or any other category protected by law.  We provide equal employment in, for example, hiring, promotion, transfers, compensation, benefits, leaves of absences and decisions about discipline or termination of employment.  We expect our employees to treat co-workers, customers, vendors and anyone else with whom employees interact as part of their jobs or at company-sponsored events with dignity and respect.

Dated "June 2017," found at http://ir.united.com/~/media/Files/U/United-Continental-

IR/governance-documents/code-of-ethics-and-business-conduct-june2017.pdf.

14.     Throughout her tenure as a flight attendant for United, Ms. Willford was outspoken, particularly among her female colleagues, regarding the connection between working as a flight attendant and infertility, and was vocal about her desire to have children and start a family.  Indeed, Ms. Willford had informed several supervisors that she eventually planned to take time off for fertility treatments.

15.     In or around June 2014, Ms. Willford was injured in the process of turning a customer's bag in the overhead luggage compartment of the flight on which she was working, causing her to suffer persistent neck and arm pain (her "spinal disability") which, during periods of exacerbation, caused extreme pain that prevented her from sleeping, which in turn caused exhaustion and fatigue.

16.     On October 15, 2015, following the submission of FMLA paperwork and doctors' notes indicating that her spinal disability caused not only great pain, but also exhaustion due to the resulting inability to sleep, United approved Ms. Willford for two days of intermittent use of FMLA leave per month to treat the spinal disability she suffered in the line of work ("intermittent FMLA leave").

17.     In or around the time Ms. Willford was granted intermittent FMLA leave, Ms. Willford also arranged to start intensive in vitro fertilization ("IVF") treatments in late November 2015, at Weill Cornell Hospital in New York City.  She had started the IVF treatment process in June 2015, but the process was set to become far more rigorous in the coming months.  The IVF treatments would require, among other treatments, multiple surgeries, frequent blood testing and invasive ultrasounds that would require her to be in New York City multiple days per week, and sometimes as much as four to five days in a seven-day period.

18.     Given that treatment of her spinal disability and her IVF treatments could not reasonably have been delayed, on October 28, 2015, Ms. Willford applied for a temporary emergency transfer from her base at the time, Dulles International Airport ("Dulles") in Virginia, to Newark Liberty International Airport ("Newark") in Newark, New Jersey, to be closer to her doctors.

**United Discriminated Against Ms. Willford on the Basis of her Sex and Disability**

19.     In late September 2015, United sent Ms. Willford a termination email.  Ms. Willford soon learned that the email had been intended for another flight attendant, but nevertheless found this "error" to be very alarming, as she had a clean dependability record at the time.  Given that she had been vocal to her supervisors about her desire to get pregnant and raise a family, Ms. Willford began to suspect that her job might be in jeopardy.

20.     In her October 28, 2015 emergency transfer request, Ms. Willford specifically cited her need to be in New York City for "daily and/or weekly monitoring," and that "[b]y being based in NYC I will be able to avoid calling in sick or block leave because I will be able to go in more frequently between trips," making the transfer request beneficial for United as well as Ms. Willford.  She also specifically stated that she was "only in NYC temporarily for medical reasons."

21.     Nevertheless, on November 3, 2015, Ms. Willford received an email from Elizabeth Cavanaugh ("Cavanaugh"), an Inflight Labor Strategy Specialist for United, denying Ms. Willford's emergency transfer request under the pretext that the request was based on "commuting issues."

22.     That same day, Ms. Willford sent a clarifying email to Cavanaugh, stating that she was seeking the emergency transfer to receive temporary medical treatment for IVF, and that her treatments required her to be in New York City several times per week.

23.     In fact, United was aware of the fact that Ms. Willford requested the emergency transfer in order to receive IVF treatments, as well as for her spinal disability and an additional disability related to her foot.  In her petition for the emergency transfer, Ms. Willford stated, "[I] have been accepted into a fertility clinic at Cornell Hospital which often requires daily [procedures] … Cornell will only treat me until my next birthday when I reach their age cut off."  Indeed, Ms. Willford explicitly stated that the "precipitating emergency" driving her transfer request was that she would be receiving IVF treatments, which were expected to last through February 2016, including intensive treatments during the requested emergency transfer period.

24.     In Cavanaugh's November 4, 2015 response to Ms. Willford's clarifying email, Cavanagh responded that "[y]our medical documentation was insufficient but *even if it weren't*," the transfer would not have been granted because it was based primarily on commuting issues. Moreover, Cavanaugh acknowledged that United knew *"time is running out on the ability to receive treatment."*  In fact, Cavanaugh admitted that she was not following normal procedure in Ms. Willford's case, stating, "We did not instruct you to gather the medical documentation *that is normally required*," while simultaneously noting that the "insufficiency" of Ms. Willford's medical documentation was a factor that United used to determine not to grant her emergency transfer request.

25.     Cavanaugh suggested that Ms. Willford apply for block FMLA leave for her IVF treatments, even though Ms. Willford had clearly stated in her emergency transfer request that, "I would have taken block leave but financially we need to have my medical benefits and income to pay for our medical bills," and that missing work would create "an added financial hardship for me and a scheduling hardship for my employer."

26.     On November 4, 2015, the same day that Ms. Willford received Cavanaugh's reply

email, Ms. Willford also received a phone call from her supervisor, Winson Waterman ("Waterman").  Waterman stated that he had reviewed Ms. Willford's emergency transfer request, and that it was denied.  Ms. Willford explained the difficulties she faced in getting IVF treatments and pain management treatments for her disabilities in New York while still trying to be available to work out of Dulles.  Waterman responded by telling Ms. Willford that ***she should reconsider whether she should be a flight attendant.***  This comment caused Ms. Willford to fear for her continued employment.

## II.   UNITED INTERFERED WITH MS. WILLFORD'S ATTEMPT TO USE FMLA LEAVE

27.     Following United's rejection of her emergency transfer request and pursuant to Cavanaugh's recommendation, Ms. Willford sought to obtain block leave through the FMLA for her upcoming, intensive IVF treatments, which included a surgical procedure.

28.     On October 27, 2015, shortly before Ms. Willford was going to start weekly and even daily visits for her infertility treatments, her fertility doctor faxed a doctor's note to United ahead of her FMLA paperwork, which stated that numerous office visits would be required in the following few months and to please excuse Ms. Willford's absence.  The doctor's note was sent to two different fax numbers at United, including the personal fax number for Kay Panos ("Panos"), the Dulles Base Director of Inflight Service.  United neglected to place the doctor's note in Ms. Willford's employee file.

29.     When Ms. Willford's doctor filed FMLA paperwork with United in order for Ms. Willford to obtain block leave for her IVF treatments ("block FMLA leave"), United denied the request, just as it had earlier denied her reasonable request for an emergency transfer from Dulles to Newark.

30.     By the time United denied Ms. Willford's application for block FMLA leave, she

was already undergoing the first round of rigorous IVF treatments and could not immediately return to work.

31.     When Ms. Willford recovered from her IVF treatments and surgery and returned to work in December 2015, United disciplined her for her absence, despite her attempts to do everything United had asked of her in applying for the block FMLA leave.

32.     After United denied her block FMLA leave for December 2015, Ms. Willford ensured that the FMLA paperwork for her next round of intensive IVF treatments and surgery, scheduled for January 7 through January 22, 2016, was in order well in advance of her next block FMLA leave, including informing Waterman of the planned block leave.

**United Discriminated Against Ms. Willford for Trying to Become Pregnant, and for Attempting to Help Despite Her Disability**

33.     As a result of United improperly refusing to grant Ms. Willford's emergency transfer request and instead forcing her to take block FMLA leave for her IVF treatments, Ms. Willford required significant additional income in order to pay her medical bills.  This need for income, coupled with her continuing fear of losing her job as a result of United's conduct, led her to work flights for 13 consecutive days in December 2015.

34.     The additional strain of working so much without a break caused her spinal disability to flare up to the point where she was unable to sleep.

35.     For her final trip of the month, United – in full knowledge that Ms. Willford was undergoing IVF treatments in an effort to become pregnant – sent Ms. Willford on a four-day layover to Brazil, *during the outbreak of the Zika virus.*

36.     During the four-day layover that Ms. Willford worked in Brazil, Ms. Willford's spinal disability was exacerbated to the point that she was unable to sleep for the entire duration of the layover due to the pain caused by her disability.

37.     On December 30, 2015, Ms. Willford landed back in the United States and returned to New York, only to discover that United had booked her for an early check-in time for another flight the following morning.  Exhausted from lack of sleep due to her spinal disability, Ms. Willford attempted to trade flight assignments to get a later check-in time so that she might be able to rest to relieve the exacerbation of her spinal disability.

38.     When she was unable to trade for a flight assignment with a later check-in time, Ms. Willford called United to exercise her intermittent FMLA leave, as she feared she would be unable to work without rest as a direct result of her spinal disability.  That night, for the first time in several days, Ms. Willford managed to get a few hours of sleep.

39.     The morning of December 31, 2015, Ms. Willford awoke to an email from Panos stating that there was a critical staffing shortage.  Concerned, Ms. Willford investigated and discovered that a flight scheduled to depart Newark would be cancelled in two hours because they were short-staffed.

40.     Having rested enough for the exacerbation of her spinal disability to abate, Ms. Willford called in to volunteer for the flight.  She explained that she had already called in to use her intermittent FMLA leave for her spinal disability, but that she'd seen the email that Newark was about to cancel a flight and wanted to help.  Specifically, Ms. Willford told the crew scheduler that she was tired ***due to her approved FMLA condition,*** and thus could not have made it to her previously-assigned early check-in, but now that she had rested, she felt well enough to try to help United keep from canceling the understaffed flight.

41.     United's crew scheduler expressed concern that Ms. Willford had utilized her intermittent FMLA leave, and then offered to work a flight operating out of a base closer to Ms. Willford's home.  United ordered Ms. Willford to stay home.

42.     That day, Ms. Willford encountered one of the doctors she saw for treatment for her spinal disability, Dr. Margaret Mei ("Dr. Mei"), in the lobby of her apartment building.  Dr. Mei suggested that Ms. Willford come into her office as a walk-in patient at the end of the day so as to treat the symptoms of her spinal disability, but neglected to mention that her office would be closing early that day for New Year's Eve.  Ms. Willford went to Dr. Mei's office that evening, only to find it closed for the holiday.  As a result, Ms. Willford attempted to self-treat her symptoms at home with physical therapy.  Nevertheless, her spinal disability became exacerbated once again.

43.     Shortly after United ordered Ms. Willford not to report to work, she developed flu-like symptoms, and her spinal disability remained exacerbated, leaving her in a state of constant pain and fatigue.

## III.    UNITED USED THE EVENTS OF DECEMBER 30-31, 2015 AS A PRETEXT TO TERMINATE MS. WILLFORD

44.     On January 2, 2016, Waterman called Ms. Willford to inform her that he was suspending her, effective immediately, and that she was to come in for a mandatory meeting at Dulles on January 6, 2016, despite her illness and pain, which still had not subsided.  Waterman informed Ms. Willford that if she did not attend the mandatory meeting, it would be grounds for termination.

45.     During this phone call with Waterman, Ms. Willford explained the circumstances behind her offer to help United on December 31, 2015, that she had not been permitted to help, that she had attempted to meet with Dr. Mei for treatment, and that she did physical therapy at home in order to try to help relieve her pain.

46.     On January 5, 2016, Ms. Willford saw another doctor for an injection procedure to relieve her pain.  The procedure worked, but she continued to be ill with flu-like symptoms, and additionally developed a blistering rash across her neck, face and torso.  Her doctor ordered her to

11

rest and recover the following day.

47.     On or around January 5, 2016, in preparation for her upcoming meeting with Waterman, Ms. Willford checked her United employee file online, and discovered that Waterman had deleted her 14 most recent letters of commendation from her employee file, and that her doctor's note from October 27, 2015 had never been placed in her file.

48.     On January 6, 2016, against her doctor's orders but fearing for her job, Ms. Willford flew to Dulles to meet with Waterman.

49.     Waterman questioned Ms. Willford regarding her explanation for her absences, and insinuated that she had lied about her treatments, her pain, and her illness – despite the fact that she was still suffering from flu-like symptoms and had a visible rash.

50.     At this meeting, Ms. Willford offered doctors' notes to explain her spinal disability and the link between the disability and her exhaustion. **Waterman refused to review them.**

51.     Ms. Willford, at this point feeling very ill, told Waterman that by keeping her in the meeting, he was preventing her from seeking medical attention, which she felt she needed. Waterman replied by intimating that if Ms. Willford left the meeting, he would terminate her employment.

52.     After several hours of questioning, Waterman told Ms. Willford that he was suspending her another week, and that there would be another mandatory meeting on January 14, 2016.  Ms. Willford reminded Waterman that she would be in the middle of block FMLA leave for IVF treatments and upcoming surgery on that date.  **Waterman informed her that failure to appear for the January 14, 2016 mandatory meeting would be grounds for termination.**

53.     Ms. Willford began two-week block FMLA leave for her next round of IVF treatments and surgery on January 7, 2016, but – because she continued to fear for her job in the

wake of Waterman's comments at the January 6, 2016 meeting – still attended her mandatory meeting with Waterman at Dulles on January 14, 2016.  Ms. Willford was forced to bring injections related to her fertility treatments with her in a cooler.

54.     At the January 14, 2016 meeting, Waterman continued his questioning, again refused to review the doctor's notes Ms. Willford proffered, and openly told Ms. Willford, "I don't believe you.  You're hiding something."

55.     Ms. Willford directly asked Waterman if he was bent on terminating her because he knew she was planning on taking maternity leave soon.  Waterman denied this, and denied ever having seen her emergency transfer application, ***despite their having spoken about it on November 4, 2015.***

56.     Still not allowed to return to work, Ms. Willford was ordered to attend a third mandatory meeting at Dulles on February 10, 2016, this one with both Waterman and Panos.

57.     At this third mandatory meeting, Ms. Willford learned that Mr. Waterman had transcribed her December 31, 2015 call to the crew scheduler, but had omitted portions from his transcription where she had referred to her "condition," instead only leaving in portions where she said she was tired or exhausted, thereby making it appear as though she was using her approved intermittent FMLA leave merely as an excuse to skip work for being tired.

58.     On February 22, 2016, Ms. Willford's union informed her that United had terminated her employment.

59.     Upon information and belief, United sought to replace Ms. Willford following her termination with another employee at a lower rate of pay in the same position.

## EEOC AUTHORIZATION TO FILE

60.     On May 12, 2016, Plaintiff filed a charge of gender discrimination, pregnancy

discrimination, and disability discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"), requesting a Notice of Right to Sue in the event the matter could not be resolved by the EEOC.

61.    The EEOC issued Plaintiff a Notice of Right to Sue, dated December 7, 2017.

62.    Plaintiff brings this Complaint within 90 days of the receipt of the Notice of Right to Sue.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF TITLE VII – SEX DISCRIMINATION

63.    Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

64.    In violation of Title VII, 42 U.S.C. §§ 2000e *et seq.*, Defendant discriminated against Ms. Willford on the basis of her sex, in that Defendant engaged in a course of conduct, as stated above, which sought to terminate, and did terminate, Ms. Willford through discriminatory conduct because of her sex.

65.    Ms. Willford is a member of a protected class (sex).  She performed her job at an acceptable level, as evidenced by her numerous letters of commendation and clean dependability record prior to Defendant's discriminatory conduct.  Defendant discriminated against her on the basis of her sex when it improperly rejected her emergency transfer request, which she submitted in order to attempt to become pregnant through IVF, by suggesting to her that she should reconsider being a flight attendant because she wished to become pregnant, and by assigning her to fly to Brazil during the outbreak of the Zika virus in full knowledge that she was undergoing IVF treatments.  United repeatedly placed Ms. Willford in compromising situations because of her

sex and her open desire to become pregnant.  Defendant ultimately terminated her as a result of this discrimination.  Following her termination, Defendant sought to replace Ms. Willford with another employee in the same position.

66.     As a proximate result of Defendant's actions, Ms. Willford has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

67.     The conduct of Defendant was done in conscious disregard of Ms. Willford's rights. Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory damages in an amount to be determined at trial.

## COUNT II

## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

68.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

69.     In violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, Defendant discriminated against Ms. Willford on the basis of her disability, in that Plaintiff was disabled, and Defendant knew of her disability – a spinal condition that left her in significant pain and unable to sleep during periods of exacerbation; Plaintiff was qualified, with reasonable accommodation, to perform the essential functions of her job; and Defendant engaged in a course of conduct, as stated above, which sought to terminate, and did terminate, Ms. Willford through discriminatory conduct because of her disability.

70.     As a proximate result of Defendant's actions, Ms. Willford has suffered and

continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

71.     The conduct of Defendant was done in conscious disregard of Ms. Willford's rights. Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory damages in an amount to be determined at trial.

## COUNT III

## VIOLATION OF THE NYSHRL – SEX DISCRIMINATION

72.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

73.     In violation of the NYSHRL, N.Y. Exec. L. §§ 296 *et seq.*, Defendant discriminated against Ms. Willford on the basis of her sex by engaging in a course of conduct with discriminatory intent, as stated above, which sought to terminate, and did terminate, Ms. Willford through discriminatory conduct because of her sex.  Defendant discriminated against her on the basis of her sex when it improperly rejected her emergency transfer request, which she submitted in order to attempt to become pregnant through IVF, by suggesting to her that she should reconsider being a flight attendant because she wished to become pregnant, and by assigning her to fly to Brazil during the outbreak of the Zika virus in full knowledge that she was undergoing IVF treatments. United repeatedly placed Ms. Willford in compromising situations because of her sex and her open desire to become pregnant.  Defendant ultimately terminated her as a result of this discrimination.

74.     As a proximate result of Defendant's actions, Ms. Willford has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of

employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

75.     The conduct of Defendant was done in conscious disregard of Ms. Willford's rights. Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory damages in an amount to be determined at trial.

**COUNT IV**

**<u>VIOLATION OF THE NYSHRL – DISABILITY DISCRIMINATION</u>**

76.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

77.     In violation of the NYSHRL, N.Y. Exec. L. §§ 296 *et seq.*, Defendant discriminated against Ms. Willford on the basis of her disability, in that Plaintiff was disabled, and Defendant knew of her disability – a spinal condition that left her in significant pain and unable to sleep during periods of exacerbation; Plaintiff was qualified, with reasonable accommodation, to perform the essential functions of her job; and Defendant engaged in a course of conduct, as stated above, which sought to terminate, and did terminate, Ms. Willford through discriminatory conduct because of her disability.

78.     As a proximate result of Defendant's actions, Ms. Willford has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

79.     The conduct of Defendant was done in conscious disregard of Ms. Willford's rights.

17

Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory damages in an amount to be determined at trial.

**COUNT V**

**VIOLATION OF THE NYCHRL – SEX DISCRIMINATION**

80.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

81.     In violation of the NYCHRL, N.Y. Admin. Code § 8-107, Defendant discriminated against Ms. Willford on the basis of her sex, in that Defendant engaged in a course of conduct, as stated above, which sought to terminate, and did terminate, Ms. Willford through discriminatory conduct because of her sex.  Defendant discriminated against her on the basis of her sex when it improperly rejected her emergency transfer request, which she submitted in order to attempt to become pregnant through IVF, by suggesting to her that she should reconsider being a flight attendant because she wished to become pregnant, and by assigning her to fly to Brazil during the outbreak of the Zika virus in full knowledge that she was undergoing IVF treatments.  United repeatedly placed Ms. Willford in compromising situations because of her sex and her open desire to become pregnant.  Defendant ultimately terminated her as a result of this discrimination.

82.     As a proximate result of Defendant's actions, Ms. Willford has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

83.     The conduct of Defendant was done in conscious disregard of Ms. Willford's rights. Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory

damages in an amount to be determined at trial.

## COUNT VI

### VIOLATION OF THE NYCHRL – DISABILITY DISCRIMINATION

84.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

85.     In violation of the NYCHRL, N.Y. Admin. Code § 8-107, Defendant discriminated against Ms. Willford on the basis of her disability, in that Plaintiff was disabled, and Defendant knew of her disability – a spinal condition that left her in significant pain and unable to sleep during periods of exacerbation; Plaintiff was qualified, with reasonable accommodation, to perform the essential functions of her job; and Defendant engaged in a course of conduct, as stated above, which sought to terminate, and did terminate, Ms. Willford through discriminatory conduct because of her disability.

86.     As a proximate result of Defendant's actions, Ms. Willford has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

87.     The conduct of Defendant was done in conscious disregard of Ms. Willford's rights. Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory damages in an amount to be determined at trial.

## COUNT VII

### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT – FMLA INTERFERENCE

88.     Plaintiff repeats and incorporates by reference the allegations stated above as if they

were set forth in full herein.

89.     By refusing to allow Plaintiff to return from FMLA leave and denying her reinstatement at the conclusion of such leave, Defendant interfered with Plaintiff's rights under the FMLA.

90.     By engaging in such interference, Defendant violated the FMLA, 29 U.S.C. §§ 2601 *et seq.*

91.     As a proximate result of Defendant's actions, Ms. Willford has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

92.     The conduct of Defendant was done in conscious disregard of Ms. Willford's rights. Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory damages in an amount to be determined at trial.

## COUNT VIII

### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT – <u>RETALIATION</u>

93.     Plaintiff repeats and incorporates by reference the allegations stated above as if they were set forth in full herein.

94.     Plaintiff's termination from employment by Defendant less than two months after the conclusion of her intermittent FMLA leave was willfully undertaken in retaliation for Plaintiff exercising her rights under the FMLA.

95.     By engaging in such retaliation, Defendant violated the FMLA, 29 U.S.C. §§ 2601 *et seq.*

96.     As a proximate result of Defendant's actions, Ms. Willford has suffered and continues to suffer substantial losses, including the loss of past and future earnings, the loss of employment benefits, severe emotional and psychological distress, physical pain resulting from said distress, severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

97.     The conduct of Defendant was done in conscious disregard of Ms. Wilford's rights. Therefore, Ms. Willford is entitled to equitable and injunctive relief and an award of compensatory damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this court grant the following relief: compensatory damages in the form of lost wages and employment benefits, punitive damages, equitable relief in the form of reinstatement of Plaintiff's former position with United, pre-judgment and post-judgment interest, reasonable attorneys' fees and costs, and such other relief as this Court shall deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: New York, New York
       February 6, 2018

                              Respectfully submitted,

                              HACH ROSE SCHIRRIPA & CHEVERIE LLP

                              By: */s/ Frank Schirripa*

                                   Frank R. Schirripa, Esq.
                                   Seth M. Pavsner, Esq.
                                   112 Madison Avenue, 10th Floor
                                   New York, New York 10016

21

Telephone: (212) 213-8311
Facsimile: (212) 779-0028

*Counsel for Plaintiff*